**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**BARRY McCOWAN,**

　　　　　　　　**Plaintiff(s),**　　　　　**CASE NUMBER: 05-73239**
　　　　　　　　　　　　　　　　　　　　**HONORABLE VICTORIA A. ROBERTS**

**v.**

**PENSKE TRUCK LEASING**
**CORPORATION, a DELAWARE**
**CORPORATION, and PENSKE**
**TRUCK LEASING COMPANY,**
**L.P., a Delaware Limited Partnership,**

　　　　　　　　**Defendant(s).**
_____/

**<u>ORDER</u>**

**I.　　INTRODUCTION**

　　　　This matter is before the Court on Defendants' Motion for Summary Judgment.

For the reasons stated below, Defendants' motion is **GRANTED IN PART and DENIED**

**IN PART**.

**II.　　BACKGROUND**

　　　　Plaintiff Barry McCowan brings this suit against his former employers,

Defendants Penske Truck Leasing Corporation and Penske Truck Leasing Company

(collectively "Penske").  Plaintiff, who is African American, alleges that he was fired

because of his race and his refusal to falsify company records.  Defendants contend

that McCowan was fired solely because of poor work performance.

1

### A.      Plymouth Facility

Penske leases vehicles to businesses and individuals.  In September 2000, Defendants hired McCowan to fill the Maintenance Supervisor position at its facility in Plymouth, Michigan.  As Maintenance Supervisor, Plaintiff was responsible for overseeing the repair and maintenance of leased vehicles.  His duties included: 1) recording necessary repairs and ensuring that the work was properly and timely performed; 2) scheduling routine preventative maintenance for leased vehicles and ensuring that safety recalls were completed; 3) submitting weekly reports regarding the number of repairs completed and the amount of preventative maintenance performed; 4) responding to "warranty action grams"[1] for the facility; and 5) supervising technicians and performing at least one technician evaluation each week.  Additionally, Defendants contend that Plaintiff's number one responsibility was to keep the customers happy at all costs.

Plaintiff's first performance evaluation was in September 2001.  It was prepared by his supervisor, Doug Hughey, and manager Thomas Racette.  Hughey and Racette gave Plaintiff an overall rating of 3.5 (on a scale of 1 to 5), which fell between "satisfactory" and "above average."  The comments were generally favorable, but Plaintiff was given five objectives for the following year:

1.      complete safety recalls for leased vehicles within 90 days;

---

[1]"A warranty action gram is a notice that is sent to a specific facility which indicates that a repair that was previously performed involved parts or services that were under warranty.  Plaintiff was responsible for submitting documentation and other information related to this warrantied work within a thirty-day period from the date the repair was performed."  Defs. br. at p. 3.

2.      complete warranty action grams within 30 days;

3.      complete at least 95% of the preventative maintenance
        appointments each month;

4.      ensure that scheduled repairs represent at least 50% of the
        repairs performed;

5.      stay within the established budgets for the Plymouth facility.

Defs. Exh. 2.  Plaintiff received a 4% merit raise.

Defendants assert that Plaintiff's performance began to decline during the next year.  They contend that his alleged performance problems were set forth in his second performance evaluation in September 2002.  *See* Def. Exh. 3.  Plaintiff, however presents a different copy of his September 2002 evaluation which is significantly more favorable.  *See* Def. Exh. 4.

The evaluation presented by Defendants was signed by supervisor John Lowe, Racette and Plaintiff, and indicates that Plaintiff's performance was rated as 2.5, which fell between "marginal" and "satisfactory."  The reduction in Plaintiff's rating was purportedly due to his failure to complete any of the objectives set in the prior year.  Additionally, in the "Skill" section of the evaluation, Lowe and Racette were critical of various aspects of Plaintiff's performance.  Likewise, in the "Performance Narrative" section, they expressed concern about Plaintiff's failure to accurately communicate with customers about the status of their vehicles and his lack of organization.

Plaintiff claims the 2002 evaluation presented by Defendants is not the same one which was reviewed with and given to him.  His copy is unsigned, but he claims it is what he received at the conclusion of his meeting with Lowe and Racette.  It rates his overall performance as 3.5 and does not contain any of the negative commentary that

3

appears in Defendants' copy, except with regard to his completion of the objectives for the prior year. Plaintiff's copy also indicates that he failed to meet any of his objectives. Notably, however, most of the favorable comments and ratings in the "Skill" section are the same or similar to the favorable comments and ratings in the 2001 evaluation. The favorable comments in the "Performance Narrative" section are also similar to those made in 2001.

Plaintiff acknowledges signing the copy Defendants presented. But, he says that the negative comments contained in Defendants' copy were not discussed during his meeting with Lowe and Racette. After the review, Plaintiff says that he simply signed the copy Lowe and Racette were reading from under the presumption that it was same as the one he was handed. Plaintiff says that he did not regard the 2002 review as negative, because the copy he received was favorable.

Defendants are unable to explain the discrepancy. They opine that the unsigned copy was a draft. However, Plaintiff points out that he received a 3% raise that year. Plaintiff also points out that the Payroll Status Change form signed by Racette lists Plaintiff's performance rating as 3.0, which is different than the rating Plaintiff received in 2001 (3.5) or in either version of the 2002 appraisal (2.5/3.5). Racette testified that Plaintiff's performance merited a raise despite the alleged deficiencies in his performance. But, Defendants do not offer an explanation for the rating Racette listed on Plaintiff's Payroll Status Change form.

While at the Plymouth facility, Plaintiff says that African American and Caucasian repair technicians who worked under him were disciplined differently. Plaintiff says that African American technicians were disciplined more often and they were written up for

4

infractions that Caucasian technicians were not.  He says that he was compelled to participate in the disparity, because his superiors asked him to write up African American technicians (even if they did not work on his shift), but discouraged him from writing up Caucasian technicians.  *See* Def. Exh. 1 at p. 169-170.  As a consequence, Plaintiff says his subordinates ridiculed him and called him an "Uncle Tom."  In late 2002, Plaintiff says he expressed his concern about the disparity to Lowe and Quality Manager Jeff Kinninger.  Plaintiff says Lowe and Kinninger indicated that they disagreed with his characterization of the situation, but said they "would take care of it."

### B.    Allen Park Facility

In June 2003, Plaintiff transferred to Defendants' facility in Allen Park, Michigan. Mark Tobin, the District Service Manager for the Detroit district who worked out of the Allen Park facility, testified that Plaintiff was transferred because Plymouth was a very busy facility and Plaintiff was struggling.  Tobin said it was suggested (it is not clear by whom) that Plaintiff work in Allen Park "in a slower, easier atmosphere to see if he could still develop."  Defs. Exh. 14 at p. 18.  Plaintiff did not oppose the transfer and his pay, benefits and other employment terms remained the same.

### i.    Racial Slur

Within one month of the transfer, one of the repair technicians used a racial slur. In July 2003, clerk Aaran Nelson overheard technician Leroy Seward (who is Caucasian) say to someone else that he was not "going to listen to that fucking nigger." Defs. Exh. 1 at p. 151.  Plaintiff was not in at the time and Seward did not refer to him by name, but Plaintiff was the only African American working in Allen Park.

Nelson reported the incident to Tobin a few days later. Tobin contacted Bob Ferda, the Allen Park Branch Service Manager and Plaintiff's immediate supervisor. Tobin says he told Ferda what Nelson said and advised him to question Seward about the incident. When Plaintiff came in, Tobin and Ferda told Plaintiff what was alleged and promised to look into it further.

A few weeks later, in August, Plaintiff had another meeting with Tobin and Ferda to discuss the status of the situation. Despite Tobin's directive, Ferda had not talked to Seward. And, Plaintiff says Tobin and Ferda told him that there was nothing they could do since they only had hearsay evidence.

After the meeting with Tobin and Ferda, Plaintiff sent an e-mail to Racette and asked if he was aware of the incident. Racette indicated that he was not. Plaintiff subsequently had another meeting with Racette and Tobin. Racette says that he offered to launch a full investigation and then decide upon the appropriate discipline. But, Racette says Plaintiff did not want the investigation. So, Racette says he suggested that a notice be distributed to the employees about the company's policy with regard to such conduct and Plaintiff agreed. In his affidavit, Plaintiff says Racette also agreed with his request that Seward be disciplined and that employees receive training to emphasize that discriminatory conduct was unacceptable.[2] But, Plaintiff disputes whether the policy was distributed (Racette claims it was), he says the training was never given, and Racette admits that Seward was never disciplined or even questioned

---

[2]In Plaintiff's deposition, he only indicates that he asked that the employees get some form of training; he does not mention that he asked that Seward be disciplined. Defs. Exh. 1 at p. 157, 158, 162.

6

about his alleged statement.

### ii.    Conflicts with Branch Service Manager

Ferda resigned (for unrelated reasons) in August 2003.  In November 2003, Bob West was hired to take Ferda's place as the Branch Service Manager and Plaintiff's direct supervisor.  Plaintiff says West became critical of him within a few months and consistently exhibited animosity towards him.  For instance, on January 2, 2004, West wrote a letter to Tobin stating that he felt that Plaintiff had a bad attitude, was projecting his dissatisfaction with the job onto his subordinates, and that Plaintiff lacked the necessary leadership skills to perform certain duties.  Pl. Exh. 3.  At the time, however, Plaintiff says he and West worked opposite shifts (West worked days and Plaintiff worked afternoons) and had not worked together for more than 10 hours total.

Tobin says West wrote the letter after he came to Tobin complaining of miscommunications with Plaintiff.  Defs. Exh. 14 at p. 41.  Tobin says he told West to sit down with Plaintiff and sort things out.  After meeting with Plaintiff, Tobin says West took it upon himself to write the letter.  Tobin met with West and says he tore up the letter in front of him because West and Plaintiff resolved the issues, the letter was unsolicited, and Tobin felt that West's assessments were premature in light of his short time on the job.[3]

Plaintiff says West also often did things which undermined Plaintiff's ability to effectively do his job.  For instance, he says West often neglected to give him

---

[3]Despite Tobin's claim that he tore up West's letter, Plaintiff said he found it in his file in late January 2004.  Keen testified, however, that the letter was not there when he reviewed it during his meeting with Plaintiff in July 2004.

information relevant to his job.  Specifically, he says on multiple occasions a vehicle came in for repair during West's shift and West would promise that it would be ready during Plaintiff's shift without telling Plaintiff or recording it in the computer.  Customers would then be angry when their vehicle was not ready as promised.  Plaintiff also says West failed to relay to him suggestions from management about particular areas which needed improvement or extra attention.  Instead, Plaintiff had to rely on the clerk and the technicians for updates and information.  Plaintiff attaches one e-mail from West to the clerk (Nelson) where West relayed a management directive that Allen Park management improve their performance in the area of preventative maintenance.  Although scheduling preventative maintenance was one of Plaintiff's duties, West did not share this information with Plaintiff and the e-mail was entitled "Just Between You and Me."  Pl. Exh. 4.

Lastly, technician Pete Laboda heard West comment that "today's a bad day to be born white," after he came out of a meeting.  Defs. Exh. 16 at p. 25.  West did not refer specifically to Plaintiff and Laboda did not know who was in the meeting.  But, Laboda assumed West was referring to Plaintiff and told Plaintiff about the incident a few hours later.  Plaintiff says West was leaving a meeting with him and Branch Manager Scott Moore, during which Plaintiff complained about being targeted unfairly for criticism.  Defs. Exh. 1 at p. 193.

There is a dispute regarding the date the comment was made.  Laboda testified that he believes it was in February or March 2004.  In his affidavit, Plaintiff also claims that Laboda told him about the comment in February or March 2004.  Pl. Exh. 1 at ¶15.  But, in Plaintiff's deposition, he testified that Laboda told him about the comment

8

approximately one month before he was fired in July 2004.  Defs. Exh. 1 at p. 201.

### iii.    Falsification of Records

Plaintiff says his supervisors at both the Plymouth and Allen Park facilities asked him to sign off on repairs which had not been done and to add or delete time from jobs in order make it appear that Penske goals had been met.  Approximately six to eight months before he was fired, however, Plaintiff says he refused to continue manipulating the paperwork.  At that point, Plaintiff says that he was not "being a team player with management" and he felt that "things were coming down on him" because of it.  Defs. Exh. 1 at p. 139.

A couple of months after Plaintiff was fired, management discovered West's practice of deleting jobs.  When confronted, West resigned.

### iv.    2003 Performance Appraisal

Tobin prepared Plaintiff's 2003 performance appraisal in January 2004.[4] Plaintiff reviewed it with Tobin and West on January 12, 2004.  Tobin rated Plaintiff's performance as 2.6, which was again between "marginal" and "satisfactory."  Plaintiff failed to achieve three of the five objectives.  And, among other things, Plaintiff was criticized for lack of good communication with co-workers, failure to motivate or direct his subordinates to ensure completion of company goals, not having knowledge of the systems which was commensurate with the amount of time he had been on the job, the quality and tardiness of warranty paperwork, and failing to relay accurate information to customers.

---

[4]The attached copy is not signed.  But, Plaintiff and Tobin's initials appear on the form.

9

Plaintiff points out, however, that many of the comments with respect to the failed objectives relate to Plaintiff's work at the Plymouth facility even though neither Tobin nor West had first hand knowledge of Plaintiff's performance in Plymouth.  Also, Plaintiff says Tobin told him that the basis of the negative evaluation was the 30 outstanding warranty action grams he left at Plymouth.  But, Plaintiff says his Plymouth supervisor, Lowe, told him that he (and another employee, Tim O'Neal) would take care of the action grams.  Plaintiff says Lowe also told him that his responsibilities at Plymouth were complete and that Plaintiff would start at Allen Park with a clean slate.  Plaintiff says he told Tobin what Lowe said and Tobin promised to look into it.  However, Plaintiff says Tobin never indicated that he did so.

Defendants argue that, even if Plaintiff's deficient performance at the Plymouth facility is disregarded, the 2003 appraisal shows that he also failed to adequately perform at Allen Park.  Tobin indicated that Plaintiff's performance fell short on three of the objectives even after the move to Allen Park.  Specifically: 1) Plaintiff had 10 action grams over 30 days; 2) preventative maintenance defects improved but did not meet the goal; and 3) scheduled repairs were not maintained at the goal percentage.  *See* Defs. Exh. 5, objectives 2-4.

### iv.    Performance Improvement Plans

#### a.    90-Day Plan

Because of the low performance rating in the 2003 evaluation, Tobin placed Plaintiff on a performance improvement plan for 90 days, beginning in January 2004. Under the plan, Plaintiff was required to meet five objectives in order to receive a merit

10

raise.  He was warned that failing to meet the objectives would "have a grave bearing"
on his employment.  Defs. Exh. 5.  Plaintiff's compliance with the objectives was to be
reviewed by the Branch Manager (Scott Moore) and the Branch Service Manager
(West) on a weekly basis.  But, Plaintiff says neither Moore nor West performed the
reviews.

At the end of 90 days, on April 12, 2004, Plaintiff's performance was reviewed
again.  He met the first objective and the third was deemed "not applicable."  But, he
was deemed to have failed to meet the remaining three objectives--numbers 2, 4 and 5.
Plaintiff contends, however, that he was not credited with completing the fourth
objective--completing three technician evaluations--because two of the evaluations
"disappeared" after he left them on West's desk.  West said he did not see them and
they were never found.  And, Plaintiff says that he did not complete the fifth objective--
weekly reports to the Service Manager of all individual score cards for direct report
technicians--because West refused to meet with him on a weekly basis.  Plaintiff says
he complained to Moore to no avail.

While the performance plan was in effect, Plaintiff was cited for a negative
incident with a customer.  In March 2004, Plaintiff called a customer's driver "lazy" three
times, when the driver balked at having to walk to another part of the facility to enter a
waiting room.  Plaintiff says that he had a casual rapport with the driver and thought that
he could joke with him.  But, the driver complained and Plaintiff was reprimanded.
Plaintiff was warned that other incidents of a like nature would result in termination.

### b.      60-Day Plan

Despite his failure to successfully complete the 90-day performance

11

improvement plan, it was extended for an additional 60 days.  But, on April 22, 2004,

District Manager Richard McLaughlin informed Plaintiff in a letter that he could be

terminated if he failed to meet any of the objectives which were set for the 60-day plan

or if there were any additional customer incidents.

Over the next 60 days, Plaintiff's performance was assessed by West and Moore

on a weekly basis.  Each week Plaintiff was deemed to have met some, but not all of his

objectives.  *See* Defs. Exh. 9.  In the last evaluation, he only met two of the five

objective.  But, Plaintiff contends that West was directly or indirectly responsible for his

failure to meet the three remaining objectives--2 (outstanding action grams), 4 (weekly

report to Branch Service Manager) and 5 (two technician audits per week).  He

indicated on the last two assessments that he disagreed with most of the criticisms.

With regard to the second objective, Plaintiff contends that he ultimately failed to

meet it after West failed to cover Plaintiff's work as promised while Plaintiff was on

vacation.  Plaintiff went on vacation for one week in mid-May.  During that week, he

says West agreed to cover his outstanding action grams but he did not.  Consequently,

there were outstanding action grams during that week and Plaintiff was criticized in his

May 26th evaluation for failing to delegate responsibility for them while he was on

vacation.  Prior to going on vacation, Plaintiff met the second objective each week.

After returning from vacation, Plaintiff had outstanding action grams every week until he

was fired.  But, Plaintiff says the majority of outstanding action grams attributed to him

were the ones for which West assumed responsibility.

Plaintiff contends that he consistently failed to meet the fourth and fifth objectives

because West failed to make himself available for weekly meetings (a claim West

denies), and because West did not review the audits with the technicians on his (West's) shift as agreed.

During the 60-day extension, Plaintiff was cited for another negative incident with a customer.  On April 29, 2004, a customer came in to take pictures of damage to his vehicle for insurance purposes.  The customer wanted a mirror which had been removed put back on the truck for the pictures.  The customer complained that Plaintiff acted as though the request was a waste of his time, suggested that the customer simply take a picture of the mirror, and, when the customer went to the truck and found the door locked, Plaintiff told him that he would have to wait for one-half hour because there were other customers ahead of him.  Defendants contend that Plaintiff's conduct was inconsistent with their policy of keeping the customer happy.

Plaintiff says the customer was actually upset because instructions Plaintiff left for the day shift, supervised by West, were not followed.  The customer left the vehicle with Plaintiff and instructed him not to begin repairs until an estimate was given.  Plaintiff says he recorded these instructions in the computer.  But, the day shift began the repairs without first calling the customer with an estimate.  When the customer came in during Plaintiff's shift, Plaintiff says he was furious that his instructions were not followed.  Plaintiff says he attempted to smooth things over, but the customer could not be mollified and subsequently submitted the complaint.  Plaintiff say he was reprimanded without being allowed to tell his side of the story, and neither West nor anyone on his shift was reprimanded for failing to comply with the instructions Plaintiff left.

13

### v.    Plaintiff Fired

On July 1, 2004, Terry Keen, the Regional Human Resources Manager for Penske's Northeastern Region, fired Plaintiff.  Keen said he made the decision based on Plaintiff's allegedly deficient performance.  The day Plaintiff was fired, was the first day Keen had personal contact with Plaintiff.

Plaintiff asserts two state law claims: 1) violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. §37.2101, *et seq.*; and 2) wrongful discharge in violation of Michigan public policy.  Defendants request summary judgment on each claim.

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine

14

issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995).  To

meet this burden, the movant may rely on any of the evidentiary sources listed in Rule

56(c).  *Cox*, 53 F.3d at 149.  Alternatively, the movant may meet this burden by pointing

out to the court that the nonmoving party, having had sufficient opportunity for

discovery, has no evidence to support an essential element of his or her case, and on

which that party will bear the burden of proof at trial.  *Tolton v. American Biodyne, Inc.*,

48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989).

The moving party does not, however, have to support its motion for summary judgment

with evidence negating its opponent's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving

party to produce evidence of a genuine issue of material fact.  Rule 56(e); *Cox*, 53 F.3d

at 150.  The nonmoving party cannot rest on its pleadings, but must present significant

probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  The mere

existence of a scintilla of evidence to support the nonmoving party position will be

insufficient; there must be evidence on which a jury could reasonably find for the

nonmoving party.  *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.    APPLICABLE LAW AND ANALYSIS

### A.    There is a Question of Fact on Plaintiff's ELCRA Claim

The ELCRA prohibits an employer from discharging an employee because of

race:

> (a) Fail or refuse to hire or recruit, discharge, or otherwise
> discriminate against an individual with respect to employment,

15

> compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

M.C.L. §37.2202(1)(a).  A plaintiff can prove unlawful discrimination with either direct or circumstantial evidence.  *Hazle v Ford Motor Co.,* 464 Mich. 456, 462-463 (2001).  Plaintiff contends that there is direct and circumstantial evidence to support his claim.

### i.   Plaintiff has not Presented Direct Evidence of Race Discrimination

Direct evidence is "'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Id* at 462 (*quoting Jacklyn v Schering-Plough Healthcare Products Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999)).  "[D]irect evidence of discrimination does not require the factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *See Johnson v Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003).[5]  When the relevance of purported evidence of discrimination is only apparent by inference, the evidence is regarded as circumstantial.  *See Manzer v Diamond Shamrock Chemicals Company*, 29 F.3d 1078, 1081 (6th Cir. 1994).  Once a plaintiff presents credible evidence of direct discrimination, the burden of persuasion shifts to the employer to show that it would have terminated the plaintiff even if it had not been motivated by discrimination. *Id*; *Jacklyn,* 176 F.3d at 926.

Plaintiff cites three incidents as direct evidence that race was a motivating factor

---

[5]Michigan courts look to federal precedent for guidance in their analysis of discrimination claims under the ELCRA.  *Harrison v Olde Financial Corp.,* 225 Mich. App. 601, 606 (1997).

16

in his discharge: 1) his claim that management at Plymouth induced him to mete out unequal discipline to African American and Caucasian technicians; 2) Allen Park management's failure to discipline Seward for using a racial slur; and 3) various acts by West, including the comment overheard by Laboda, which Plaintiff contends demonstrate his discriminatory animus.  On their face, none of these alleged facts compels the conclusion that race was a factor in Plaintiff's discharge.

In each instance, such a conclusion could only be drawn through multiple inferences.  Indeed, Plaintiff argues that the alleged unequal treatment at Plymouth and tolerance of the racially offensive comment at Allen Park "constitute evidence of a discriminatory atmosphere at Penske, which in turn may serve as *circumstantial evidence* of individualized discrimination directed at Plaintiff."  Pl. br. at p. 16 (emphasis added).  And, with regard to West, Plaintiff essentially contends that jurors could *infer* from West's behavior and his comment (which was not explicitly directed at Plaintiff) that West had a racial bias which influenced the ultimate decisionmaker.

The evidence Plaintiff offers is circumstantial, not direct.  Therefore, the Court analyzes it accordingly.

### ii.    Plaintiff Presented Circumstantial Evidence of Race Discrimination

When a discrimination claim is based on circumstantial evidence, the three-step *McDonnell Douglas*[6] burden shifting approach applies:

> Initially, the plaintiff must present evidence sufficient to establish a prima facie case of . . . discrimination. Once a plaintiff satisfies his or her prima facie burden, the burden of production shifts to the

---

[6]*McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973).

17

employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's nondiscriminatory explanation is a mere pretext for intentional age discrimination.

*Ercegovich v Goodyear Tire & Rubber Co.,* 154 F.3d 344, 350 (6th Cir. 1998)(internal citations omitted).

A plaintiff's burden at the *prima facie* stage is not onerous; it can be easily met. *See Cline v Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000).  But, the burden of persuasion is on the plaintiff at all times.  *Texas Department of Community Affairs v Burdine,* 450 U.S. 248, 253 (1981).  Defendant only has the burden of production. "[D]efendant need not persuade the court that it was actually motivated by the proffered [legitimate, non-discriminatory] reasons." *Id* at 255.  An "employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not . . . motivated by discriminatory animus." *Id* at 257.

### a.    Prima Facie Claim

To establish a *prima facie* claim of race discrimination, Plaintiff must demonstrate that:  (1) he belongs to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) he suffered the adverse employment under circumstances giving rise to an inference of unlawful discrimination.  *Hazle,* 464 Mich. at 463.  Defendants contend that Plaintiff failed to prove the third and fourth elements.

With regard to the third element, Defendants argue that Plaintiff's negative

18

performance appraisals demonstrate that Plaintiff was not qualified for the position. There is no merit to Defendants' assertion.  At the *prima facie* stage, the court only needs to assess whether the plaintiff "was meeting the employer's expectations *prior to* the onset of the events that the employer cites as its reason for the termination." *Cline*, 206 F.3d at 663.

In this case, it is undisputed that Plaintiff's first evaluation in September 2001 was favorable.  Plaintiff's performance in every respect was rated between the categories of "satisfactory" and "above average."  Def. Exh. 2.  Additionally, Plaintiff received at least two merit raises--in 2001 and 2002.  The alleged decline in Plaintiff's performance which purportedly precipitated his eventual termination did not begin until after the first evaluation.  Alleged performance problems which develop and contribute to the termination must be analyzed at the pretext stage; they are not relevant to the Court's analysis at the *prima facie* stage.  *Id.*  Plaintiff presented sufficient evidence that he was qualified for his position.

Plaintiff also presented sufficient evidence to support the fourth factor--that he was fired under circumstances giving rise to an inference of unlawful discrimination. Although Plaintiff does not clearly indicate what he relies upon to establish the fourth element, it is presumed that he relies upon the same three incidents cited as direct evidence.

The Court finds the evidence submitted concerning his conflicts with Branch Service Manager West satisfy Plaintiff's burden.  Specifically, there is evidence that, either one month or five months before Plaintiff was fired, West made a comment with

19

arguably negative racial undertones,[7] and that West sabotaged Plaintiff's progress under the performance action plans.

Defendants contend that West's comment that "today's a bad day to be born white" was merely an isolated, stray remark which was not explicitly directed at Plaintiff and is insufficient to create an inference of discriminatory animus. The Court finds that reasonable jurors could disagree.

"Generally, the inquiry into whether a discriminatory comment is an 'isolated' or 'stray' remark is directed at remarks that are either made by a person not involved in the challenged employment decision or are temporally removed from the employment decision." *Plegue v Clear Channel Broadcasting, Inc.,* 2005 W.L. 3133508, *7 (E.D. Mich. 2005). *See also Krohn v Sedgwick James of Michigan*, 244 Mich. App. 289, 301 (2001)(statement made two years before plaintiff fired too remote); *Phelps v Yale Security, Inc.,* 986 F.2d 1020, 1026 (6th Cir. 1993)(statements made one year before plaintiff laid-off too remote to have influenced decision). Abstract remarks which are not directed at anyone in particular are also insufficient to support a finding of discrimination. *Gagne v Northwestern National Insurance Company*, 881 F.2d 309, 314 (6th Cir. 1989), *overruled in part on other grounds*, 509 U.S. 502 (1993).

Here, however, the timing and context of West's comment and his involvement in the ultimate decision to fire Plaintiff give rise to an inference that race was a factor.

---

[7]Defendants argue that the Court should disregard Plaintiff's assertion in his affidavit that the comment was made in February or March 2004, because it conflicts with his deposition testimony that it was made in June 2004. It is not necessary for the Court to address this discrepancy, however, because there is other evidence that the comment was made in February or March. Pete Laboda testified that he believes he heard the comment in February or March. Def. Exh. 16 at p. 26.

When West made the comment, Plaintiff was working under the performance improvement plans at the time and West was charged with evaluating Plaintiff's progress. Even though West did not make the ultimate decision to fire Plaintiff, he exercised indirect influence over Keen's decision. That is, West was responsible for evaluating Plaintiff's progress under the performance action plans, he was aware that Plaintiff could be fired if he failed to meet his objectives, and, per Plaintiff, he took multiple steps to undermine Plaintiff's progress under both plans by failing to cooperate as necessary to enable Plaintiff to meet the three objectives he was ultimately deemed to have failed.

Additionally, although West did not refer to Plaintiff by name, one could infer that he was referring to Plaintiff and race. It is undisputed that Plaintiff was the only African American working in Allen Park at the time. And, Plaintiff testified that West made the comment immediately after leaving a contentious meeting with him and Moore during which Plaintiff complained that Moore and West unfairly targeted him for criticism. Certainly West's comment is subject to other interpretations. But, it is for the trier of fact to decide whether another meaning was intended. *See Plegue*, 2005 W.L. 3133508 at *7 ("[A] *single* remark from a supervisor made while engaged in the challenged employment decision--even if the statement might be subject to multiple interpretations--is sufficient to constitute direct evidence, and the remark's weight and believability are strictly matters for the finder of fact.).

In sum, because Plaintiff's burden at this stage is minimal and all inferences must be construed in his favor, the evidence presented is sufficient to satisfy the fourth element of a *prima facie* claim. Reasonable jurors could infer that race was a factor in

21

Plaintiff's discharge because: 1) West made a comment with arguably negative racial undertones; 2) one could infer that the comment was directed at Plaintiff; 3) the comment was made while Plaintiff was working under one of the performance action plans; 4) West was responsible for evaluating Plaintiff's progress under those plans; 5) West was aware that the evaluations would be considered in deciding whether to terminate Plaintiff at the conclusion of the plans; and 5) West negatively evaluated Plaintiff's progress under the action plans despite the fact that he (allegedly) impeded Plaintiff's efforts to meet his objectives.

The alleged situation at the Plymouth facility and Defendants' failure to discipline Seward do not bolster Plaintiff's claim, however, because the incidents were remote in time; both happened over one year before Plaintiff was fired.  Additionally, Plaintiff was working under different supervision at the Plymouth facility and there is no evidence that his Plymouth supervisors participated in or otherwise influenced the decision to terminate him.

### b.    Legitimate Business Reason

Because Plaintiff established a *prima facie* case, the burden shifts to Defendants to rebut the presumption that race was a factor in their decision to fire Plaintiff. Defendants met this burden by alleging and presenting evidence that Plaintiff was fired for poor performance.  *See Johnson,* 319 F.3d at 866 (plaintiff's alleged inability to perform his duties is a legitimate, nondiscriminatory basis for discharge).  The burden, therefore, shifts back to Plaintiff to prove that Defendants' proffered reason is merely a pretext for discrimination.

22

c.      Pretext

"'A plaintiff can demonstrate pretext by showing that the proffered reason: 1) had no basis in fact; (2) did not actually motivate the employer's actions; or 3) was insufficient to motivate discharge.'" *Singfield v Akron Metropolitan Housing Authority*, 389 F.3d 555, 565 (6th Cir. 2004).  "Regardless of which option is used, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that defendants intentionally discriminated against him.'" *Johnson*, 319 F.3d at 866.  Plaintiff appears to rely upon the first method.  Therefore, he must establish that "the proffered bases for [his] discharge never happened, *i.e.,* that they are 'factually false.'" *Manzer,* 29 F.3d at 1084.

Plaintiff essentially denies that he had extensive performance problems.  Rather, he argues that Defendants took steps to create the false impression that his performance was deficient.  It is a close question, but Plaintiff presents evidence which raises a question of fact regarding whether Defendants are, in fact, misrepresenting the extent of his performance problems.

First, there is a discrepancy in Plaintiff's 2002 evaluation.  Plaintiff contends that the substance of the negative 2002 evaluation Defendants rely upon was never presented to him.  Rather, he claims he was given and reviewed with his supervisors the more favorable (unsigned) evaluation.  Even though the unsigned copy shows that the prior year's objectives were not met, the balance of it includes mostly favorable comments and ratings.  Additionally, Plaintiff was given a merit raise for that year, and Racette inexplicably indicated on Plaintiff's payroll form that his rating was 3.0, which designates "satisfactory" on Defendants' rating scale.

23

Second, although Plaintiff does not dispute the validity of the criticism leveled in the 2003 evaluation,[8] he contends that he was successful in correcting the noted deficiencies through the performance action plans, except to the extent West sabotaged his efforts.  That is, Plaintiff claims that he only failed to meet the objectives which required West's assistance or cooperation.  Although the only support for Plaintiff's claim of sabotage is his own testimony, Plaintiff's testimony is evidence which must be construed in his favor.

When the disputed evidence about the extent of Plaintiff's performance problems is considered along with the *prima facie* inference that race was a factor, there is a question of fact regarding whether the proffered reason for discharging Plaintiff is mere pretext for the true motive--unlawful discrimination.  Therefore, the Court denies Defendants' motion for summary judgment on Plaintiff's ELCRA claim.

### B.    Michigan Public Policy

"In general, in the absence of a contractual basis for holding otherwise, either party to an employment contract for an indefinite term may terminate it at any time for any, or no, reason."  *Suchodolski v Michigan Consolidated Gas Co.,* 412 Mich. 692, 695 (1982).  However, under Michigan law, "some grounds for discharging an employee are so contrary to public policy as to be actionable," including when an employee is discharged for acting in accordance with an established legislative enactment, statutory

---

[8]He only contends that he was promised that he would not be held responsible for anything that occurred at Plymouth after his transfer to Allen Park.  He does not dispute the accuracy of most of the claims about his work at Plymouth (except with regard to the action grams) or the criticism of his poor performance at Allen Park over the 2002-2003 evaluation period.

24

right or duty, or for refusing to violate a law in the course of employment.  *Id.*

Plaintiff contends that reasonable jurors could find that he was fired because he refused to continue the "illegal" practice of falsifying Penske records to make it appear as though the service department at his facility was more productive.  This claim is frivolous.  Plaintiff does not identify any statute or law that was violated by Penske management's alleged practice of manipulating internal service records.  He cites the entire sequence of Michigan's Motor Vehicle Service and Repair Act, M.C.L. §257.1301, *et seq.,* but he does not specify the provision of the Act (within the sequence) which allegedly applies.  Therefore, Plaintiff failed to make a *prima facie* showing that he was discharged in violation of Michigan's public policy.  Defendants' motion for summary judgment on this claim is granted.

## V.   CONCLUSION

The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's claim that he was fired in violation of Michigan public policy, but **DENIES** Defendants' motion on Plaintiff's race discrimination claim.

**IT IS ORDERED.**

  /s/ Victoria A. Roberts
**VICTORIA A. ROBERTS**
**Dated: 2/16/07**                    **UNITED STATES DISTRICT COURT**

25